IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TERRY CRAIG,

        Plaintiff,

v.                                                     Civil Action No. 1:05-CV-78

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

    Plaintiff, Terry Craig, (Claimant), filed his Complaint on May 9, 2005, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on August 3, 2005.[2]  Claimant filed his Motion for Summary Judgment and Memorandum in Support on September 20, 2005.[3]  Commissioner filed her Motion for Summary Judgment and Brief in Support on October 13, 2005.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment and Memorandum in Support</u>.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 10.

[4] Docket No. 11.

2. <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

C.   <u>Recommendation</u>

I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly evaluated the opinion of Claimant's treating sources.

## II.  Facts

A.   <u>Procedural History</u>

On July 16, 2001, Claimant filed for Disability Insurance Benefits (DIB) alleging disability since April 12, 2001. The application was denied initially and on reconsideration. Claimant filed no further appeal. On July 29, 2002, Claimant made a protective initial filing for Supplemental Security Income. On August 19, 2002, he submitted a new claim for DIB alleging disability since April 12, 2001. The applications were denied initially and on reconsideration. A hearing was held on February 26, 2004 before an ALJ. The ALJ's decision, dated April 15, 2004, denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on March 16, 2005. This action was filed and proceeded as set forth above.

B.   <u>Personal History</u>

Claimant was 38 years old on the date of the February 16, 2004 hearing before the ALJ. Claimant has a high school education and completed two or three years of college with past relevant work experience as an aide at a mental health facility.

C.   <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: April 12, 2002 – March 16, 2005.

**Fairmont General Hospital, 4/18/01- 4/12/01, Tr. 275-326**
Diagnoses:
1. Acute gastroenteritis.
2. Mild to moderate dehydration.
3. Accelerated hypertension.
4. Seizure disorder-multifactorial.
5. Respiratory arrest requiring intubation and mechanical ventilation.
6. Alcohol withdrawal.
7. Migraine headache.
8. Chronic cervical spine.
9. Left lower lobe pneumonia.
10. Hematemesis.
11. Abnormal liver functions.

**Fairmont General Hospital, X-ray, Left Ribs, 5/11/01, Tr. 279**
Impression: I don't see any displacement fracture. Question of some minimal contour change of the left 8th rib, uncertain importance.

**Fairmont General Hospital, Dr. Warden, 4/13/01, Tr. 281-282.**
Impression:
1. Seizure with respiratory arrest requiring cardiopulmonary resuscitation.
2. Hypertension secondary to alcohol withdrawal.
3. Sinus tachycardia.

**Fairmont General Hospital, Dr. Ciarolla, 4/13/01, Tr. 286-289**
Impression:
1. Coffee ground emesis, hematemesis - This is most consistent with his history of probably Mallory-Weiss tear. It does not seem that he has lost significant blood according to all the parameters. I would watch him and recheck his blood count in the morning. In the meantime, control his other medical problems.
2. Abnormal liver function tests. They were not the ususal alcoholic ratio. His albumin and platelet counts were reasonable, so it is unlikely he has significant chronic liver disease of an advanced degree, although I cannot rule out a chronic hepatitis, etc. This may have to be addressed in the future, although acutely I think control of his seizure and hypertension would be prominent. At some point, may consider upper gastrointestinal tract evaluation after things quite down (sic). Watch for any signs of further bleeding.

**Fairmont General Hospital, X-ray, Chest, 4/16/01, Tr. 291**
Impression: Atelectasis/infiltrate in left lower lobe. Follow up recommended.

**Fairmont General Hospital, X-ray, Chest, 4/15/01, Tr. 294**

There is still some increased markings right upper lobe medially.

**Fairmont General Hospital, X-ray, Chest, 4/14/01, Tr. 295**
Impression: Resolving atelectasis or infiltrate within the medial aspect of the right upper lung zone. Follow up exam is recommended.

**Fairmont General Hospital, X-ray, Chest, 4/13/01, Tr. 296**
Impression: Better position of tube.

**Fairmont General Hospital, CT Scan, Head, 4/13/01, Tr. 297**
Impression: Very asymmetrically positioned study, left maxillary sinus fluid.

**Fairmont General Hospital, X-ray, Chest, 4/13/01, Tr. 298**
Impression: Advancement of et tube into the orifice of the right main bronchus. Atelectasis vs. consolidation right upper lobe. Improved central markings.

**Fairmont General Hospital, X-ray, Chest, 4/13/01, Tr. 299**
Impression: Et tube about 5.5 cm above the carina. Poor respiration.

**Fairmont General Hospital, X-ray, Abdominal series, 4/12/01, Tr. 300**
Impression: Radiopaque material probably within the bowel Otherwise unremarkable chest and abdomen.

**Unknown source, probably John Jezioro, D.C., 7/27/01-5/11/01, Tr. 329-352**
Tenderness, restriction and moderate pain to palpation of C4, 5, 6, T1 thru 5.

**Dr. Pravin Patel, 9/6/01, Tr. 252-358**
Final Impression:
1.      Hypertension.
2.      Major depressive disorder.
3.      Chronic migraine headaches.
4.      Chronic pain in the cervical spine with possible degenerative disc disease and radiculopathy, right arm.
5.      Recent admission in April 2001 with a number of discharge diagnoses as discusses above including seizure disorder.

**Residual Functional Assessment, 9/18/01, Tr. 359-366**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations:
Balancing, stooping, kneeling, crouching, crawling–frequently.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations:
Extreme cold, extreme heat–avoid concentrated exposure.
Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation,
hazards–unlimited.

**Marion Health Care Hospital, 4/15/02-7/9/02, Tr. 414-417**
Seizure disorder, BP, allergies.

**Appalachian Family Chiropractic, 8/29/02, Tr. 418**
Mild to moderate tenderness and restriction at C4-7 and T1-4.

**Appalachian Family Chiropractic, 8/27/02, Tr. 419**
Mild to moderate tenderness and restriction at C4-7 and T1-5.

**Appalachian Family Chiropractic, 8/22/02, Tr. 420**
Mild to moderate tenderness and restriction at C4-7 and T1-5.

**Appalachian Family Chiropractic, 8/19/02, Tr. 421**
Mild to moderate tenderness and restriction at C4-7 and T1-5.

**Appalachian Family Chiropractic, 8/15/02, Tr. 422**
Mild to moderate tenderness and restriction at C4-7 and T1-5.

**Appalachian Family Chiropractic, 8/13/02, Tr. 423**
Mild to moderate tenderness and restriction at C4-7 and T1-5.

**Appalachian Family Chiropractic, 8/6/02, Tr. 424**
Moderate rigidity of the cervical and upper dorsal paraspinal musculature, tenderness and
restriction at C4-6 and T2-5.

**Appalachian Family Chiropractic, 8/1/02, Tr. 425**
Tenderness and restriction at C4-6 and T2-5.

**Peggy Allman, M.A., 10/3/02, Tr. 430-434**
Diagnostic Impression:
Axis I:            Major depressive disorder, recurrent, moderate.
                Pain disorder associated with psychological features., chronic.

|          | Agoraphobia with out a history of panic disorder. |
| Axis II: | V71.09 |
| Axis III: | Degenerative arthritis, compressed vertebrae, right side headaches as reported by client. |

## Residual Functional Capacity Assessment, Mental, 10/21/02, Tr. 436-440

The ability to remember locations and work-like procedures, not significantly limited.

The ability to understand and remember very short and simple instructions, not significantly limited.

The ability to understand and remember detailed instructions, moderated limited.

The ability to carry out very short and simple instructions, not significantly limited.

The ability to carry out detailed instructions, moderately limited.

The ability to maintain attention and concentration for extended periods, moderately limited.

The ability to perform activities within a schedule, not significantly limited.

The ability to sustain an ordinary routine, without special supervision, not significantly limited.

The ability to work in coordination with or proximity to others without being distracted by them, moderately limited.

The ability to make simple work-related decisions, not significantly limited.

The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, moderately limited.

The ability to interact appropriately with the general public, not significantly limited.

The ability to ask simple questions or request assistance, not significantly limited.

The ability to accept instructions and respond appropriately to criticism from supervisors, moderately limited.

The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, not significantly limited.

The ability to respond appropriately to changes in the work setting, not significantly limited.

The ability to be aware of normal hazards and take appropriate precautions, not significantly limited.

The ability to travel in unfamiliar places or use public transportation, moderately limited.

The ability to set realistic goals or make plans independently of others, not significantly limited.

## Psychiatric Review Technique Form, 10/21/02, Tr. 441-454

Affective Disorders

Disturbance of mood: depressive syndrome (anhedonia; psychomotor agitation; decreased energy; feelings of guilt or worthlessness; difficulty concentration or thinking).

Anxiety-Related Disorders

A persistent irritation fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation.

Rating of Functional Limitations

Mild:   restriction of activities of daily living;

| Moderate: | difficulties in maintaining social functioning;  difficulties in maintaining concentration, persistence, or pace; |

Repeated episodes of decompensation:        none.

## Pravin I. Patel, M.D., 11/6/02, Tr. 455-459

Final Impression: cervical spine degenerative desk disease with spinal stenosis; radiculpathies in the right hand; major depressive disorder; seizure disorder; hypertension; migraine headaches; past history of respiratory arrest requiring intubation and mechanical ventilation.

## Fairmont Physicians Inc, X-ray, Lumbar spine, 11/6/02, Tr. 459

Impression: no significant bony abnormality demonstrated.

## Fairmont Physicians Inc, 11/12/02, Tr. 460

The patient is wary, minimally communicative, tense.

## Fairmont Physicians Inc, 10/24/02, Tr. 461

The patient describes the following symptoms: previously enjoyed activities are no longer pleasurable; a loss of energy or motivation; excessive worrying; fatigue; sadness; feelings of worthlessness; loss of appetite; a decrease in sociability; difficulty concentrating; difficulty making decisions.  Based on the risk of morbidity without treatment and his report of the level of interference with functioning, severity of symptoms is considered moderate.

## Physical Residual Functional Capacity Assessment, 11/21/02, Tr. 469-477

Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit/stand 6 of 8 hours, unlimited push and pull.

Postural limitations:
Climbing ramp/stairs, balancing, stooping, kneeling, crouching, crawling, frequently.
Climbing ladder/rope/scaffolds, due to seizures, never.

Manipulative limitations:
Reaching all directions, feeling, unlimited.
Handling, fingering, limited..

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations:
Extreme cold, avoid concentrated exposure.
Hazards, due to seizures, avoid all exposure.

**Dr. Engenio Menez, Tr. 478-487**
Diagnosis: HTP, seizure disorder, anxiety, depression.

**Physician Office Center, 1/16/03, Tr. 488-489**
Assessment: seizure disorder, low back pain.

**Physical Residual Functional Capacity Assessment, 1/16/03, Tr. 490-498**
Exertional limitations: Occasionally 20 lbs., frequently 10 lbs., sit/stand 6 of 8 hours, unlimited push and pull.

Postural limitations:
Climbing ramp/stairs, balancing, stooping, kneeling, crouching, crawling, frequently.
Climbing ladder/rope/scaffolds, due to seizures, never.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations:
Extreme cold, hazards, avoid concentrated exposure.
Hazards (heights), avoid all exposure.

**Dr. Jeziros, 8/29/02-7/24/03, Tr. 509-561**
Tenderness and restriction at C4-6 and T1-5.

**Mountain State Physical Therapy, 5/22/03-8/5/03, Tr. 562-578**
Goals established at the start of care (met):
1.      Increase upper extremity strength.
2.      Increase ROM;
3.      Cervical flexion;
4.      Extension;
5.      R/L side bending; R/L rotation.
6.      Decrease pain;
7.      Improve endurance;
8.      Independent home program;
9.      Improve neck disability index.

**United Summit Center, 8/30/03 to 9/10/02, Tr. 579-587**
Assessment:
Axis I:                          Depressive symptoms, NOS; history of bipolar affective disorder type II; questionable secondary gain.  The patient is currently in appeals for Social Security Disability.  The patient has been on Workers' Compensation for

his injuries in the past.

Axis II:       Deferred.
Axis III:      Medical History, as above.
Axis IV:      Financial Stressors.
AXIS V:      GAF 60.

**Fairmont Rehabilitation Center, 8/5/03-9/26/03, Tr. 588-597**
Diagnosis: multi-level disc dz.
Rehabilitation potential: fair.

**Dr. Mouhannad Azzouz, M.D., 8/4/03-9/26/03, Tr. 598-602**
Assessment: multi-level disc ds; chronic pain.

**Marion Health Care Hospital, 4/15/02-4/7/03, Tr. 603-605**
Diagnosis: neck, back (chronic) pain.

**Engenio Menez, 11/26/02-6/25/03, Tr. 606-612**
Impressions: HTN; chronic disc disease; DJD; major depression; seizure disorder (no seizure since 2001).

**MRI, thoracic spine, 4/12/03, Tr. 610, 630-631**
Impression: Small disc herniations and multiple intravertebral herniations, the so-called Schmorl nodes, as outlined above. Not evidence for acute changes.

**MRI, cervical spine, 4/12/03, Tr. 611, 632-633**
Impression: Mild degenerative changes in the cervical vertebral column.

**Dr. Azzouz, 8/4/03, Tr/ 613-614**
Some depression; no focal motor or sensory deficits; no limitation in his spinal joint movements; no remarkable spinal tenderness; reflexes were symmetric at 2+ with flexor plantars bilaterally.

**Fairmont Rehabilitation Center, 9/26/03-11/4/03, Tr. 615-621**
Diagnosis: multi level disc disease.

**Dr. Menez, 3/5/03-12/17/03, Tr. 635-641**
Impression: HTN; SDJD; Thoracic spine disc disorder; seizure disorder; headache.

**Dr. Menez, 10/23/03, Tr. 642**
DJD of cervical spine, thoracic disc disease, seizure disorder.

**Residual Functional Capacity Assessment, Mental, Jay H. Fast, Ed.D., 11/12/03, Tr.643-646**
Making occupational adjustments: poor in all categories.
Making performance adjustments: poor in all categories.
Making personal-social adjustments:

demonstrates reliability, fair.
poor in the remaining categories.

**United Hospital Center, 1/15/04, Tr. 647-653**
Preoperative diagnosis: musculoskeletal lower rib cage pain on the left side.

**United Pain Management, 12/24/03-2/3/04, Tr. 654-666**
Assessment:   1.      Diffuse myofascial pain in the midthoracic are left more than the right.
              2.      Musculoskeletal rib pain on the left side.
              3.      Neck pain with some right-sided radicular symptoms.

**Fairmont Physicians, Inc., 11/20/03-2/12/04, Tr. 669-679**
Axis I:              Bipolar disorder.
Axis II:      Depressed.
Axis III:     Chronic pain due to HNP.

D.      Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 696-717):

Q       Now once you - - what changes in your condition did you see after that hospitalization as compared to prior to the hospitalization?

A       Well, I started having problems most of the way down my spine to my mid back area and along my rib.  Actually it kind of extends sometimes up toward the front - -

Q       On the left side?

A       Yes, the lower rib, or it's like the second to third, last rib in that area.

Q       And when you were released from the hospital did the anticipate that pain would go away?

A       Yes.  Well, like I said, they thought it was pneumonia.  And after a month or so, you know, they kept telling me it would go away.  And finally I went back and they did x-rays

but they couldn't find where anything was broken or anything like that.

Q        Now was there any - - had you ever had back pain prior to that hospitalization?

A        No, I didn't.

Q        Now was there any change in your neck pain?

A        It was getting worse because I wasn't able to continue with the chiropractor's treatments the way he was giving them to me.

Q        Why is that?

A        Well, because the way he was laying me on the table he had to be a lot more careful and everything.  I have a hard time laying down flat now.  I've got to kind of be propped over to one side and - -

Q        Well, now you - - even today you still have both the mid back and the neck pain, is that correct?

A        Yes.

Q        All right.  Well, let's talk about the mid back pain first.  Where is it located?

A        Well, it's like several sections down my spine probably about three areas mostly on the left side, toward the left side of my spine.  And then, like I said, the rib area that comes around down here.

Q        How often do you have pain there?

A        Oh, it's pretty much constant.  It varies in frequency.  Sometimes it feels a little bit better but most of the time it's pretty - -

Q        If you - -

A        - - bad.

Q - - if you had to rate that pain on a scale of one to ten where would you place the kind of constant level that you have?

A The constant level is probably about a seven to eight I would say.

Q And does it pretty much stay the same all the time or do you have times when it's better and times when it's worse?

A Sometimes it's better. Sometimes it's a lot worse too.

Q Okay. How often do you get periods in which it's much worse?

A Oh, pretty frequently. Normally several times a week. Sometimes it lasts even a whole week or more at a time.

Q And can you describe what that's like?

A It's sharp stabbing really painful. Hard to move, it makes it real hard to move because sometimes a little movement can bring this sharp pain.

Q Are there any - - is there anything you know that brings those episodes on?

A Well, just simple little movements sometimes. If I reach too far. With my neck if I turn it just the wrong way the least little bit or anything it, you know, gives me a bad problem too.

*          *          *

Q How often do you have neck pain now?

A It's fairly consistent too - -

Q Now if you're - -

A - - constant.

Q In comparison to your mid back is your neck less severe, more severe or about the

same level?

A    The neck's normally a little less severe than my back but sometimes, I mean they alternate. Sometimes one's worse than the other.

Q    Okay, what - - where do you have neck pain?

A    It's on the lower left hand side - - my right hand side, I'm sorry. And, like I said, also whenever I have a lot of problems I'll get like shooting headaches. It shoots up the back of my head and kind of just sits behind like my right eye and it lasts for days sometimes. They gave me some headache medications but they don't help a whole lot.

Q    How often do you get those types of headaches?

A    It could be like once a week or more. It depends on what I'm doing. I have trouble, if I try to read anything or look down for too long that's - - it makes it act up. That's when it's really bad.

Q    Are you restricted in any other, other than looking down, and your range of motion of your neck?

A    I - -

Q    Does it bother you to look up?

A    Oh, yes, pretty much moving it in any most any direction and straight ahead.

Q    Do you have any difficulty with your arms and hands?

A    My right hand is numb. Sometimes it's spread up to my elbow before sometimes when it gets too bad.

Q    Does - - is it a constant numbness or does it come and go?

A    Oh, it's constant.

Q       Where do you have numbness in that hand?

A       Right now it's like from my mid hand out to my fingers.  I can kind of feel up close to my wrist.  But, like I said, sometimes it's gone up to my elbow before and I haven't been able to -       Q       Are you - -

A       - - feel that.

                    *                    *                    *

Q       Now as far as you - - do you have any difficulty with reaching?

A       Yes.

Q       What problems does that cause for you?

A       Oh, a lot in the back areas and stuff?

Q       Are you talking about your mid back area?

A       Yes.  Well, yes, upper to mid back.

Q       Does it bother you at all to work at desk level with something?

A       Oh, looking down gives me severe headaches.

Q       How long are you able to look down for before that happens?

A       Not long at all.  I find if I'm reading something normally I can make it maybe through a paragraph or so.  I used to love to read books and I can't really do that anymore.

                    *                    *                    *

Q       What kind of symptoms do you have from the depression?

A       Just not wanting to live anymore, to be honest.  Just dealing with all this pain I just want to put an end to it sometimes so bad.  It's - - I've just pretty much not wanted to be around anybody.  I don't talk to anybody anymore.  I - - well, also including with the pain I don't

go out or anything unless I absolutely have to just for like doctor visits or whatever.

*           *           *

Q      Do you have any hobbies?

A      Not really anymore.  I used to love reading and I used to do a lot of gardening and that's definitely out of the question.  Boy, I even used to like to play music a lot.  I used to mix music and stuff like that.  But I - -

Q      You play an instrument or work with - -

A      With a mixer board - -

Q      Okay.

A      - - just with a pre-recorded music.  But I can't even do that much anymore because it just, it takes so much getting up and down that I - - everything's just collecting dust.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 717-723 ):

BY ADMINISTRATIVE LAW JUDGE:

Q      Then would you describe the last, the past relevant work in terms of skill and exertional levels?

A      Yes, Your Honor.  For ten years, from 1991 to 2001, he worked, according to the DOT, it would characterized be mental retardation aide.  It would be medium and skilled.  Prior to that he worked for approximately a year as a receptionist.  That work is sedentary and semi-skilled.  Then prior to that for approximately four years worked as a nursing assistant.  That work is medium and semi-skilled.

Q        All right.  Then let me ask you to assume a hypothetical individual of the claimant's age, educational background, and work history who would be able to perform a range of light work.  Would require a sit/stand option.  Perform all postural movements occasionally except could not climb ladders, ropes, or scaffolds.  Should not be required to do extremely repetitive and constant neck movements.  Should work in a low stress environment with no production line type of pace or independent decision making responsibilities.  Would be limited to unskilled work involving routine and repetitive instructions and tasks.  and should have not more than occasional interactions with other persons.  Would there be any work in the regional or national economy that such a person could perform?

A        Yes, Your Honor.  And I'll define the local regional economy as 20% of all unskilled jobs in the state of West Virginia according to the Department of Labor and Statistics.  There would be the work of sewing machine operator.  In the local regional economy there are 69 jobs.  In the national economy 114,248 jobs.  There would be the work of a general office clerk.  In the local regional economy there are 181 jobs.  In the national economy 165,819 jobs.  There would be the work of a mail clerk and that would be working in private industry as opposed to working for the Postal Service.  There would be 85 jobs in the local economy and 79,258 jobs in the national economy.

Q        And if you would reduce the exertional level to sedentary and retain the other limitations?

A        Yes, Your Honor.  There would be the work of a credit authorization clerk.  In the local economy there are 11 jobs.  In the national economy 11,133 jobs.  There would be work of a bookkeeper or accounting clerk.  In the local economy there are 62 jobs.  In the national

economy 71,090 jobs. There would be the work of a surveillance system monitor. In the local economy there are 13 jobs. In the national economy 12,947 jobs.

Q      And is anything in your testimony inconsistent with anything in the DOT?

A      No, Your Honor.

Q      Counsel.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q      We have a mental residual functional capacity assessment that was completed by Mr. Craig's treating therapist. Could you take a look at the limitations that are on that assessment and tell me if there are any jobs given that assessment?

A      Just on this first page here?

Q      No, there's several pages, two or three pages there.

A      Okay, so what do you want me to - -

Q      I mean given - -

A      - - just in general - -

Q      - - given those limitations. Poor abilities to function in the areas that are marked. With those - -

A      Okay.

Q      - - limitations are there jobs a person could perform?

A      Well, in the area of making occupational adjustments it has follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration. The first seven it's rated poor. I believe the jobs that I had indicated would accommodate those limitations even

though a person is poor in those areas. The area where there's maybe a problem would be maintaining attention and concentration and it's poor. If I had a quantification of the difficulty with attention and concentration perhaps I could give an opinion of how it would affect performing a job. The other areas, making performance adjustments, understand complex job instructions, that's been ruled out as far as like simple routine - -

Q        Um-hum.

A        - - jobs. Understand, remember, carry out detailed instructions, that's rules out as far as simple jobs as far as being, you know, a limitation. And then understand, remember simple instructions, that could be a problem as far as - - but in a job that's routine and repetitive the person really doesn't need to remember and carry out simple job instructions. The job is the same pretty much every day. So - -

Q        So if we quantify this that the combination of the areas that we have here that would take him off task, whether that's because of concentration or it's because of his inability to interact, regardless of which one of them the poor rating falls under but the combination of them takes him off task at least an hour a day. How - -

A        Okay.

Q        - - how would affect the ability, his ability to work?

A        If an individual were off task one hour for every workday for whatever reason there would be not jobs that an individual could perform at the required levels of productivity.

Q        And in the type of work that we're talking about what is the acceptable level of absenteeism? How much work can a person miss and still maintain employment?

A        Even in unskilled employment if an individual misses more than two days a

month that will eventually lead to unemployment, being unemployed.

E.        Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

- History of alcohol use, use of cannabis. (Tr. 26, 29, 287).

- Able to sit, 10-15 minutes. (Tr. 713).

- Able to stand, 10-15 minutes. (Tr. 713).

- Able to walk short distances. (Tr. 713).

- Spends 5-6 hours in bed every day. (Tr. 714).

- Does the dishes. (Tr. 715).

- Cooks for himself. (Tr. 715).

- Does some laundry. (Tr. 715).

### III.  The Motions for Summary Judgment

A.        Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred by failing to properly evaluate the opinions of Claimant's treating sources.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly evaluated the opinions of Claimant's treating sources.

B.        The Standards.

1.     <u>Summary Judgment</u>.     Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her

insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

      6.     <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

      7.  <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

      8.     <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

      9.     <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once

claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

THE ALJ ERRED IN DISMISSING THE OPINIONS OF CLAIMANT'S TREATING SOURCES.

Claimant maintains that the ALJ erred by failing to properly evaluate the opinions of Dr. Menez, Dr. Fast and the pain management physician. Commissioner counters that the ALJ properly evaluated the opinions of Claimant's treating sources.

The opinion of Claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). To decide whether the impairment is adequately supported by medical

22

evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1. (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

In reviewing the decision of the ALJ, the Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. Weighing conflicting evidence from medical experts is exactly what the ALJ is required to do. See Books v. Chater, 91 F3d 972, 979 (7th Cir. 1996)(pointing out that when assessing conflicting medical evidence from medical experts, an ALJ must decide, based on several considerations, which doctor to believe).

All medical opinions are to be considered in determining the disability status of a claimants. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and

disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3.

In this case, the ALJ summarized almost the entire medical record before him (Tr. 22) and rejected the opinions of Dr. Menez, Dr. Fast and the pain management physician, as they were not supported by any clinical and laboratory diagnostic techniques and were inconsistent with the other objective medical evidence in the record. (Tr. 34-39).

Specifically, the ALJ noted that, although Dr. Menez appeared to be supportive of Claimant's efforts to obtain disability, "[Dr. Menez's] statements as to expected duration of the claimant's purported disability/inability to work have consistently remained vague." (Tr. 35, 642). The ALJ also noted that, although Dr. Menez stated that Claimant's symptoms were "credible and consistent with the objective medical findings," he offered no opinion as to Claimant's work-related abilities or identified any symptoms that would prevent Claimant from working. (Tr. 35, 642). The ALJ further noted that, contrary to Claimant's claims of completely disabling symptoms, Dr. Menez's April 2001 physical examination was "essentially unremarkable." (Tr. 35, 275-277). Moreover, the ALJ noted that on April 25, 2001, Dr. Menez signed a form from Claimant's employer purporting to excuse Claimant from work activity for a seizure disorder, hypertension, depression and dehydration that were "still

resolving," wherein Dr. Mendez referenced no debilitating or chronic neck injury, neck or back pain, headaches, alcohol abuse or rib injury.  (Tr. 27).  Also, in January 2003, Dr. Menez rated Clamant's prognosis as "fair."  (Tr. 609).

Dr. Menez's opinion was also inconsistent with the other medical evidence in the record. For example, in September 2001, Dr. Patel reported that Claimant's gait was normal; he was able to walk on his heels and toes and squat and arise; his range of motion was normal in all of this joints; his muscle strength was substantially normal in all of his extremities except for a slight reduction in his right arm; he had no muscle atrophy; and an EKG was withing normal limits. (Tr. 33, 354).  In this regard, the ALJ noted that "[o]ther than the relatively minor findings regarding the right upper extremity, the claimant underwent what was essentially an unremarkable physical exam and such medical evidence certainly does not support the claimant's subjective complaints."  (Tr. 33).  At the November 2002 examination, performed by Dr. Patel, it was noted that Claimant's gait was satisfactory.  (Tr. 34).  Claimant was noted to "attempt" to squat and arise with "support."  (Tr. 34).  Dr. Patel also noted that Claimant had "some" sensory impairments and motor weakness in the right hand.  A lumbar spine X-ray was unremarkable. (Tr. 34).  Finally, Dr. Azzouz reported that Claimant had no focal, motor or sensory deficits and no limitations in spinal joint movements and also no spinal tenderness.  (Tr. 35, 613).  Therefore, the ALJ correctly found that Dr. Menez's opinion is not entitled to controlling weight.  (Tr. 35).

With respect to Dr. Fast, the ALJ stated the following:

> The Administrative Law Judge does not accept Dr. Last's (sic) opinions as to the claimants' (sic) functional abilities because they were rendered on an essentially blanket, indiscriminate basis; are inadequately supported by discussion or specific testing; appear predominately based upon the claimant's subjective statements; and are inconsistent with other evidence of record. (Tr. 39).

The ALJ further noted that "Dr. Last (sic) appears to project a significant amount of sympathy with regard to the claimant's financial plight." (Tr. 38).

Indeed, Dr. Fast's opinion that Claimant had a poor mental ability to deal with any aspect of working was contradicted by the objective medical evidence in the case. For example, Dr. Herndon reported that Claimant was well-oriented, his concentration and attention were grossly intact, his intelligence was average and his insight and judgment were fair. (Tr. 32, 37, 580). Dr. Herndon also rated Claimant's symptoms as only moderate in nature and questioned Claimant's credibility with regard to Claimant's complaints. (Tr. 32, 58). Additionally, Ms. Allman reported that Claimant was well-oriented; there was no evidence of a disturbance of his thought process; his insight was within normal limits and his judgment was average; his recent and remote memory were within normal limits; his persistence was only mildly deficient; and his pace was within normal limits. (Tr. 433-434, 37-38). Dr. Allman opined that Claimant's prognosis was good. (Tr. 433). Finally, Mr. Roman, the state agency physician, assessed that Claimant would be capable of following two to three step directions in a low stress work setting. (Tr. 38, 438). Accordingly, the ALJ correctly found that Dr. Fast's opinion was not entitled to controlling weight.

Finally, with respect to the December 24, 2003 findings of the pain management physicians, the ALJ noted that they were inconsistent with Dr. Azzouz's findings of four months earlier. The ALJ stated that "[w]hile Dr. Azzouz found essentially no motor or range of motion limitations, the pain clinic doctor found decreased strength in the upper extremities, arm limitations, and 'exquisite' tenderness over the lower rid area. One of the diagnoses was diffuse myofascial pain." (Tr. 36, 613, 663-665). The ALJ noted that this is the only time such a

diagnosis appeared in the record. (Tr. 36). The ALJ also noted that Dr. Azzouz is a neurologist, while the pain management physician's specialty was unclear. (Tr. 36). <u>See</u> 20 C.F.R. § 404.1527 (2005). Accordingly, the ALJ properly found that the pain management physician's opinion was not entitled to controlling weight.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly evaluated the opinion of Claimant's treating sources.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: May 8, 2006

/s/ James E. Seibert
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE