## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


TERRY CRAIG,

        Plaintiff,

v.                            CIVIL ACTION NO. 1:05CV78
                                     (Judge Keeley)

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on May 9, 2005 the Court referred this Social Security action to United States Magistrate James E. Seibert with directions to submit proposed findings of fact and a recommendation for disposition. On May 9, 2006, Magistrate Seibert filed his Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. Rule 6(e), to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Report and Recommendation. On May 19, 2004, plaintiff, Terry Craig, through counsel, Regina L. Carpenter, filed objections to the Magistrate's Report and Recommendation.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

### I. PROCEDURAL BACKGROUND

On July 16, 2001, Terry Craig ("Craig") filed for Disability Insurance Benefits ("DIB") alleging disability since April 12, 2001. The Commissioner denied the application initially and on reconsideration and Craig did not appeal. On July 29, 2002, Craig filed a protective initial filing for Supplemental Security Income ("SSI"). On August 19, 2002, he submitted a new claim for DIB, alleging disability since April 12, 2001. The Commissioner denied both applications initially and on reconsideration.

On February 26, 2004, an Administrative Law Judge ("ALJ") conducted a hearing. On April 15, 2004, the ALJ determined Craig was not disabled and denied the claim. On March 16, 2006, the Appeals Council denied Craig's request for review of the ALJ's decision. On May 9, 2005, Craig filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision.

### II. PLAINTIFF'S BACKGROUND

At the time of the February 16, 2004 hearing, Craig was thirty-eight (38) years old. He has a high school education and two or three years of college. His past relevant work experience includes employment as an aide at a mental health facility.

## III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found:

1.  Craig meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the period at issue;

2.  Craig has not engaged in substantial gainful activity since the alleged onset of disability;

3.  Since April 12, 2001, Craig has had medically determinable impairments that either individually or in combination, are "severe" and have significantly limited or are expected to significantly limit his physical or mental ability to perform basic work activities for at least 12 consecutive months: degenerative arthritis and disc disease of the cervical and thoracic spine; reported history of headaches, hypertension; reported history of seizure associated with alcohol withdrawal; and major depressive disorder, recurrent 20 CFR §§ 404.1520(c) and 416.920(b);

4.  Since April 12, 2001, Craig has had no medically determinable impairments, whether considered individually or in combination that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix I, Subpart P, Regulation No. 4;

5.  Craig's allegations regarding his impairment-related limitations, as purported to exist since April 12, 2001, are not fully credible;

6.  Since April 12, 2001, Craig has had the residual functional capacity to perform at least a range of unskilled work within a low stress environment that requires no more than a light level of physical exertion, affords the option to either sit or stand, requires no climbing of ladders, ropes or scaffolds but may require

3

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

any other postural movements to be performed at least occasionally, requires no extremely repetitive and constant neck movements, entails no exposure to temperature extremes or to hazards, such as dangerous moving machinery or unprotected heights, entails no production line type of pace or independent decision-making responsibilities, involves only routine and repetitive instructions and tasks, and requires no more than occasional interaction with other persons (20 CRF §§ 404.1567 and 416.967);

7.    Since April 12, 2001, Craig has at all times been unable to fully perform the requirements of any of his past vocationally relevant work (20 CFR §§ 404.1565 and 416.965);

8.    Craig is considered a "younger individual" (20 CFR §§ 404.1563 and 416.963) with "more than a high school education" (20 CFR §§ 404.1564 and 416.964);

9.    Craig has a skilled and semi-skilled work background but has been unable to engage in skilled work since April 12, 2001 (20 CFR §§ 404.1568 and 416.968);

10.   Although Craig has had impairment-related limitations that have since April 12, 2001 precluded his ability to perform the full range of even light exertional work, using Medical-Vocational Rule 202/21 as a framework for decision-making, there are a significant number of suitable jobs within the national economy that he could perform. Examples at the light exertional level include sewing machine operator (69 regionally/114,248 nationally), general office clerk (181 regionally/165,819 nationally) and mail clerk/private (85 regionally/79,528 nationally). Examples at sedentary exertional level include credit card authorization clerk (11 regionally/ 11,133 nationally), bookkeeping/accounting clerk (62 regionally/71,090 nationally) and surveillance system monitor (13 regionally/12,947 nationally); and

11.   Craig has not been under a "disability," as defined in the Social Security Act, at any time since April 12, 2001 (20 CFR §§ 404.1520(f) and 416.920(f).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

## IV.  PLAINTIFF'S OBJECTIONS

Craig objects to the report and recommendation, alleging that the record does not contain substantial evidence to support the ALJ's findings regarding the weight afforded to the medical opinions of the treating general practitioner, the treating psychologist and the pain management specialist.

## V.  MEDICAL EVIDENCE

The following relevant medical evidence covers April 12, 2001 through March 16, 2005, the period that the ALJ determined Craig was not under a disability:

1.    An April 12, 2001 abdominal series x-ray report from Fairmont General Hospital indicating a calcification or radiopaque material over the mid-epigastric area and right column that may be within the bowel, bowel gas pattern otherwise unremarkable and unremarkable chest and abdomen;

2.    An April 13, 2001 chest x-ray report from Fairmont General Hospital indicating ET tube has been slightly withdrawn and now terminates at about 2.5 cm above the carina, still appears to have some atelectasis or consolidation in the right upper lobe;

3.    An April 13, 2001 CT scan from Fairmont General Hospital indicating no evidence of intra-axial or extra-axial mass or hemorrhage, positioning of the patient caused an appearance suggestive of mass effect on the left, normal ventricles and sulci and left maxillary sinus fluid;

4.    An April 13, 2001 chest x-ray report from Fairmont General Hospital indicating the ET tube had been advanced with the tip in the orifice of the right main bronchus, a hazy patchy process in the right upper lobe that may be atelectasis which may be due to positioning of the ET tube, and observing that aspiration pneumonia might also be a consideration;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

5.   An April 13, 2001 chest x-ray report from Fairmont
General Hospital indicating an ET tube about 5.5 cm above the
carina, poor  respiration, seizure and worsening condition;

6.   An April 13, 2001 report from Bradford Warden, M.D.,
consulting physician, indicating Craig had a seizure with
respiratory arrest requiring cardiopulmonary resuscitation, had
hypertension secondary to alcohol withdrawal and had sinus
tachycardia;

7.   An April 13, 2001 report from David Ciarolla, M.D.,
consulting physician indicating an impression of coffee ground
emesis, hematemesis  consistent with patient's history of probable
Mallory-Weiss tear with no significant blood loss according to all
the parameters.  Dr. Ciarolla recommended watching the patient and
rechecking the blood count in the morning and controlling his other
medical problems. Dr. Ciarolla noted abnormal liver function tests
that were not the ususal alcoholic ratio.  His albumin and platelet
counts were reasonable, "so it is unlikely he has significant
chronic liver disease of an advanced degree, although I cannot rule
out a chronic hepatitis, etc.  This may have to be addressed in the
future, although acutely I think control of his seizure and
hypertension would be prominent." Dr. Ciarolla recommended that at
"some point, may consider upper gastrointestinal tract evaluation
after things quite down (sic)" and directed staff to watch for any
signs of further bleeding;

8.   An April 15, 2001 x-ray report indicating "there is still
some increased markings right upper lobe medially."  A direct
comparison to prior films was not possible. Stated PA and lateral
chest x-ray would be useful;

9.   An April 16, 2001 chest x-ray report from Fairmont
General  Hospital  indicating  normal  heart  size,
atelectasis/infiltrate in left lower lobe, no pleural effusion and
recommending a follow up;

10.  An April 18, 2001 discharge summary from Fairmont General
Hospital indicating diagnoses of acute gastroenteritis, mild to
moderate dehydration, accelerated hypertension, seizure disorder-
multifactorial, respiratory arrest requiring intubation and
mechanical ventilation, alcohol withdrawal, migraine headache,
chronic cervical spine, left lower lobe pneumonia, hematemesis, and
abnormal liver functions;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

11.  A May 11, 2001 x-ray report of the left ribs from Fairmont General Hospital indicating no displacement fracture, some minimal contour change of the left 8th rib, no effusion or pneumothorax and clear lungs;

12.  Patient treatment notes from an unknown medical source, probably John Jezioro, D.C., dated January 18, 2001 through July 27, 2001 (the relevant period is May 11, 2001 through July 27, 2001) indicating continued complaints of right-sided neck pain and stiffness and soreness as well as right hand numbness and tingling and also noting that Craig had failed to make his appointments due to other medical conditions for which he was hospitalized for a few days and had CPR resulting in a rib injury.  The notes dated May 21, 2001 through June 5, 2001 indicate that Craig continued to improve and feel "somewhat better";

13.  A June 18, 2001 note from the unknown medical source indicating Craig returned to work with a 25 pound lifting restriction;

14.  A June 20, 2001 note from the unknown medical source indicating Craig reported making it through work with less pain than he thought;

15.  A June 22, 2001 note from the unknown medical source indicating Craig had some increased pain in the upper dorsal spine as well as increased numbness in the hand due to returning to work;

16.  A June 25, 2001 note from the unknown medical source indicting Craig stated "he was hurting very badly today, he tried to do some light work on his own over the weekend" and noting that Craig had contacted Dr. Menez for some pain medication and was told "that they were sorry but they could not help";

17.  A June 26, 2001 note from the unknown medical source indicating that Craig has increased soreness since he started working again, upper back and rib pain and tenderness and restriction at C-4 thru 7, T-1 thru 5.  It further noted that Craig called two hours after his adjustment and reported being very sore. The medical source noted that he might have to take Craig back off work;

18.  A June 27, 2001 note from the unknown medical source indicating that Craig reported "quite a bit of pain yesterday at work after doing some simple tasks such as reaching above his head

as well as squatting and bending" and that the pain was causing him
to be depressed.  The note further indicates that Craig left work
on June 26, 2001 to see a psychologist who prescribed Neurotin.
The source recommended continuing the Interferential and US as well
as adjusting with the activator and applying ice and taking it easy
for a couple of weeks to see "if we can get this healed up and get
him back to work";

19.  Notes from the unknown medical source dated July 9
thru 27, 2001 indicating severe headaches, continuing neck pain and
numbness, moderate tenderness as well as rigidity throughout the
right side cervical spine and into the upper dorsal spine;

20.  A September 6, 2001 DDS physical report from Pravin
Patel, M.D., indicating

> The patient is a well-built, well-nourished,
> well-oriented, somewhat obese and ambulatory
> man. He ambulates independently. He does not
> need any assistive device to walk. Gait is
> normal. He is able to walk on the toes and the
> heels. He is able to squat and arise.
>
> . . .
>
> There is a slight weakness noted in the right
> hand grip. Range of motion is normal in all of
> the joints. Muscle strength is 5/5 in all
> extremities except the right upper extremity
> with muscle strength 4/5. EKG is within normal
> limits with nonspecific ST-T wave changes.
> There is no muscle atrophy or abnormal muscle
> movements noted.

Dr. Patel diagnosed hypertension, major depressive disorder,
chronic migraine headaches, chronic pain in the cervical spine with
possible degenerative disc disease and radiculopathy, right arm,
recent admission in April 2001 with a number of discharge diagnoses
as discussed above including seizure disorder;

21.  A September 6, 2001 lumbar spine and chest, x-ray report
from MVA Fairmont Clinic indicating no acute cardiopulmonary
disease and no significant bony abnormality;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

22.  A September 18, 2001 Residual Functional Assessment from Fulvio R. Franyutti, M.D., indicating that Craig could occasionally lift 50 lbs., frequently lift 25 lbs., stand or sit 6 hours in an 8 hour workday, had unlimited ability to push and pull, had the ability to frequently balance, stoop, kneel, crouch, crawl, had no manipulative, visual or communicative limitations, must avoid extreme cold, extreme heat and had to avoid concentrated exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation and hazards. Dr. Franyutti reduced Craig's RFC to medium due to pain;

23.  A September 20, 2001 Psychiatric Review Technique from Joseph Kuzniar, licensed psychologist, indicating mild limitation to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation each of extended duration. Dr. Kuzniar diagnosed depression that was not severe;

24.  A February 15, 2002 RFC assessment from Cynthia Mae Osborne, M.D., indicating a diagnosis of seizure disorder, headaches and cervical sprain.  Osborne noted that Craig could occasionally lift 50 lbs, frequently lift 25 lbs, sit or stand 6 hours in an 8-hour workday and had unlimited ability to push and/or pull, could occasionally climb, balance, stoop, kneel, crouch or crawl, had no manipulative, visual or communicative limitations, had no environmental limitations except for the need to avoid hazards.  Dr. Osborne reduced Craig's RFC to medium with height and hazard restrictions;

25.  Treatment follow-up notes dated March 15, 2002 through July 9, 2002 from Marion Health Care Hospital indicating Craig requested medication for a seizure disorder, blood pressure and allergies. Craig listed medications as Dilantin, Zestoretic, Paxil, Zenormin, Claritin, Depakote, Trazodone. Doctor dispensed Claritin, Dilantin and Depokote;

26.  An August 29, 2002 treatment and progress note from Appalachian Family Chiropractic indicating continued complaints of no change in neck, right arm and hand pain and intermittent headaches.  Inspection and palpation revealed mild to moderate tenderness and restriction at C4 through 7 and T1 through 4. Recommendations included Interferential and Ultrasound to the lower cervical and upper dorsal spine, adjustment of the dorsal spine with the activator and into the cervical curvature;

27. An August 1, 2002 treatment and progress note from Appalachian Family Chiropractic indicating tenderness and restriction at C4-6 and T2-5;

28. An August 6, 2002 treatment and progress note from Appalachian Family Chiropractic indicating moderate rigidity of the cervical and upper dorsal paraspinal musculature, tenderness and restriction at C4-6 and T2-5;

29. An August 13, 2002 treatment and progress note from Appalachian Family Chiropractic indicating mild to moderate tenderness and restriction at C4-7 and T1-5;

30. An August 15, 2002 treatment and progress note from Appalachian Family Chiropractic indicating mild to moderate tenderness and restriction at C4-7 and T1-5;

31. An August 19, 2002 treatment and progress note from Appalachian Family Chiropractic indicating mild to moderate tenderness and restriction at C4-7 and T1-5;

32. An August 22, 2002 treatment and progress note from Appalachian Family Chiropractic indicating mild to moderate tenderness and restriction at C4-7 and T1-5;

33. An August 27, 2002 treatment and progress note from Appalachian Family Chiropractic indicating mild to moderate tenderness and restriction at C4-7 and T1-5;

34. Treatment notes from United Summit Center for the period from August 30, 2002 through September 10, 2002. A September 10, 2002 office note from United Summit Center indicating an assessment of Axis I:Depressive symptoms, NOS; history of bipolar affective disorder type II; questionable secondary gain due to appeals for social security disability; Axis II: Deferred, Axis III: Medical History of hypertension, pinched nerve, seasonal allergies, seizure disorder Axis IV: Financial Stressors and AXIS V: GAF 60. The recommendation was to continue current medications and add Topamax;

35. An October 3, 2002 Mental Status Evaluation from Peggy Allman, M.A., indicating Diagnostic Impression of Axis I: Major depressive disorder, recurrent, moderate, pain disorder associated with psychological features, chronic, Agoraphobia without a history of panic disorder; Axis II: V71.09; Axis III: Degenerative

arthritis, compressed vertebrae, right side headaches as reported by client.

Ms. Allman indicated that Craig's prognosis was good, that his daily activities include caring for his own hygiene, cooking, trying to clean and wash clothes, shopping only early in the day, driving and watching television, normal social functioning with examiner, limited social functioning with an occasional visitor, no church attendance or social or civic organizations, average concentration, mildly deficient persistence, pace within normal limits, moderately deficient immediate memory, recent and remote memory within normal limits and ability to manage his own finances;

36. An October 21, 2002 RFC Assessment, Mental, from Frank D. Roman indicating no significant limitations in the ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions, the ability to carry out very short and simple instructions, the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions and the ability to set realistic goals or make plans independently of others; moderate limitations in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods and the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to travel in unfamiliar places or use public transportation. Roman also indicated Craig was able to perform routine activities and follow two to three step directions in a low stress setting;

37. An October 21, 2002 Psychiatric Review Technique Form from Frank D. Roman indicting disturbance of mood, depressive syndrome anhedonia, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty in concentration or

thinking and anxiety-related disorders, a persistent irritation
fear of a specific object, activity or situation which results in
a compelling desire to avoid the dreaded object, activity or
situation.

Roman noted mild functional limitations in restriction of
activities of daily living, moderate difficulties in maintaining
social functioning, concentration, persistence, or pace and no
repeated episodes of decompensation;

38. An October 24, 2002 follow up psychiatric evaluation from
Fairmont Physicians Inc. indicating Craig stated that "previously
enjoyed activities are no longer pleasurable" and that he has a
loss of energy or motivation, excessive worrying, fatigue, sadness,
feelings of worthlessness, loss of appetite, a decrease in
sociability, difficulty concentrating and difficulty making
decisions. It noted that "based on the risk of morbidity without
treatment and his report of the level of interference with
functioning, severity of symptoms is considered moderate." Current
medications, which were Paxil 20 mg, Trazadone, Depakote, Dilantin
and Topomax, were continued;

39. A November 6, 2002 DDS report form Pravin I. Patel, M.D.,
indicating cervical spine degenerative disk disease with spinal
stenosis, radiculopathies in the right hand, major depressive
disorder, seizure disorder, hypertension, migraine headaches, and
a past history of respiratory arrest requiring intubation and
mechanical ventilation. Patel noted that Craig did not require any
assistive device to walk, had a normal gait, could walk on toes and
heels but demonstrated a slight imbalance and could squat and arise
with support;

40. A November 6, 2002 lumbar spine X-ray report from
Fairmont Physicians Inc, indicating no significant bony
abnormality;

41. A November 12, 2002 follow-up visit psychiatric
evaluation from Fairmont Physicians Inc. indicating that Craig had
had minimal response to the treatment. The doctor recommended
increasing the dosage of Paxil to 50 mg, continued the Trazadone,
Depakote, Dilantin and Topomax, and discussed stress reduction
techniques;

42. A November 21, 2002 Physical Residual Functional Capacity
Assessment from Thomas Lauderman, D.O., indicating Craig could

occasionally lift 50 lbs., frequently lift 25 lbs., sit or stand 6 hours of an 8 hour work day, had unlimited ability to push and pull, could never climb ramps or stairs due to the seizure disorder, could frequently balance, stoop, kneel, crouch or crawl, had limited ability in handling and fingering, had unlimited reaching in all directions and feeling, had no visual or communicative limitations, and had to avoid exposure to extreme cold and hazards but no other environmental limitations. Dr. Lauderman reduced Craig's RFC due to pain and fatigue;

43. A November 26, 2002 note from Dr. Engenio Menez indicating a diagnosis of HTP, seizure disorder, anxiety, depression and migraine headaches;

44. Office notes for the period from August 29, 2002 through July 24, 2003 from Dr. Jeziros indicating continued complaints of no change in his neck and right arm pain and intermittent headaches and also indicating mild to moderate tenderness and restriction at C4-6 and T1-5 on inspection and palpation. Interferential and Ultrasound to the lower cervical and upper dorsal spine as well as adjustment of the dorsal spine with the activator and into the cervical curvature were continued;

45. A January 16, 2003 note from Physician Office Center indicating an assessment of seizure disorder, low back pain and recommending an MRI of the L-spine;

46. A January 16, 2003 Physical Residual Functional Capacity Assessment from Fulvio Franyutti, M.D., indicating Craig could occasionally lift 20 lbs., frequently lift 10 lbs., sit or stand 6 hours of an 8 hour work day, unlimited ability to push and pull, could occasionally climb ramps or stairs, could never climb ladders, ropes or scaffolds due to seizure disorder, could frequently balance, stoop, kneel, crouch or crawl, had no manipulative, visual or communicative limitations, had to avoid concentrated exposure to extreme cold and had to avoid all exposure to hazards. Franyutti reduced Craig's RFC to light due to seizures and pain;

47. An August 5, 2003 discharge summary from Andrew Barrish, Physical Therapist at Mountain State Physical Therapy, reflecting treatment during the period of May 22, 2003 through August 5, 2003 indicating the goals established at the beginning of treatment were to increase upper extremity strength, increase ROM, cervical flexion, extension, R/L side bending, R/L rotation, decrease pain,

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

improve endurance, independent home program, and improve neck disability index. The patient discharged himself because of lack of progress. Barrish recommended follow-up with physician;

48. Treatment notes from Mouhannad Azzouz, M.D. at Fairmont Rehabilitation Center for the period from August 5, 2003 through September 26, 2003 indicting continued complaints of headaches, cervical and upper back pain and numbness in the right hand. Dr. Azzouz diagnosed multi-level disc disease and the potential for rehabilitation as fair. Dr. Azzouz, assessed multi-level disc disease and chronic pain and recommended Celebrex and Tylenol, possible referral to a pain clinic and to avoid heavy lifting;

49. Treatment notes from Marion Health Care Hospital for the period from April 15, 2002 through April 7, 2003 indicating continuing complaints of pain and a diagnosis of neck, back (chronic) pain;

50. Treatment notes from Engenio Menez, for the period from November 26, 2002 through June 25, 2003 indicating HTN, chronic disc disease, DJD, major depression, seizure disorder and recommending continuation of current medications and follow-up appointments;

51. An April 12, 2003 report from a thoracic spine MRI indicating small disc herniations and multiple intravertebral herniations, the so-called Schmorl nodes. No evidence for acute changes;

52. An April 12, 2003 cervical spine MRI indicating at C3-C4 level some localized displacement of disc material in the right central and foraminal zone with associated endplate ostephyte formation representing disk herniation of protrusion configuration, at C4-C5 level, some generalized displacement of disc material representing bulge with association endplate osteophyte formation with some narrowing of the right neural foramen, at C6-C7 level, some localized displacement of disk material in the midline representing a herniation of protrusion configuration having a broad base with some mild diffuse endplate osteophyte formation and an impressions of mild degenerative changes in the cervical vertebral column;

53. An August 4, 2003 report from Mouhannad Azzouz, M.D., indicating on examination no focal motor or sensory deficits, no limitation in his spinal joint movements, no remarkable spinal

tenderness, reflexes were symmetric at 2+ with flexor plantars bilaterally and noting that "in his review of symptoms, the most remarkable finding is some depression for which he is followed by the psychiatrist." Dr. Azzouz also noted that he believed the patient had chronic back pain "most likely due to his multi-level disc disease", Dr. Azzouz scheduled another physical therapy course, continuation of Tylenol to alternate with Celebrex and a possible referral to a pain clinic;

54.  A physical therapy service plan of care from Fairmont Rehabilitation Center for the period from September 26, 2003 through November 4, 2003 indicating a diagnosis of multi-level disc disease, complaints of continuing pain with no significant difference noted by the patient and a notation dated November 4, 2003 indicating "pt not making gains on PT. Recommend referral to pain clinic";

55.  Treatment notes for the period from March 5, 2003 through December 17, 2003 from Dr. Menez indicating continued complaints of pain and an impression of HTN, SDJD, Thoracic spine disc disorder, seizure disorder and headache and recommending continuation of meds and follow-up appointments;

56.  An October 23, 2003 letter from Dr. Menez to counsel for Craig indicating treatment from September 11, 2000 for multiple medical problems such as DJD of cervical spine, thoracic disc disease and seizure disorder. Dr. Menez noted that: "In my opinion, Mr. Craig's symptoms are credible and consistent with the objective medical findings";

57.  A November 12, 2003 Residual Functional Capacity Assessment, Mental, from Jay H. Fast, Ed.D., indicating the first psychotherapy session was on March 21, 2003 and a total of 26 sessions.  A diagnosis of major depressive disorder recurrent and severe with current symptoms of hopelessness and helplessness as the most prevalent aspect.  Fast's clinical observation was that Craig manifested "the most defeat of any patient I have seen in some time. I am of the professional opinion that his depression is associated with his inability, or any healthcare providers' inability to provide relief for his physical pain." Fast further indicated that he believed Craig's symptoms are credible and consistent with the medical findings, that he met the criteria for Affective Disorders 12.04 and that "he, with no doubt, is disabled";

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

58. A January 15, 2004 operation record from United Hospital Center indicating an intercostal nerve block on the left side T12 through T9 and a preoperative and postoperative diagnosis of musculoskeletal lower rib cage pain on the left side;

59. Treatment notes for the period from December 24, 2003 through February 3, 2004 from United Pain Management, indicating an assessment of diffuse myofascial pain in the midthoracic are left more than the right, musculoskeletal rib pain on the left side, neck pain with some right-sided radicular symptoms; and

60. Treatment notes for the period from November 20, 2003 through February 12, 2004 from Fairmont Physicians, Inc., indicating a Axis I: bipolar disorder, Axis II: Depressed, Axis III: Chronic pain due to HNP and noting a depressed mood, poor concentration, inattention, easily fatigued, sleeping most of the day, fine appetite, no interaction with family, has no close friends and rarely leaves home.

## VI.  DISCUSSION

Craig contends that the ALJ failed to properly evaluate the opinions of Dr. Menez, his treating physician, Dr. Fast, the treating psychologist, and the pain management physician. The Commissioner contends that the ALJ properly evaluated the opinions of the treating sources and assigned the proper weight to the opinions.

In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

[4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

20 C.F.R. § 404.1527 provides:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship*. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will

look at the treatment the source has
provided and at the kinds and extent
of examinations and testing the
source has performed or ordered from
specialists and independent
laboratories.

(3) *Supportability*. The more a medical source
presents relevant evidence to support an
opinion particularly medical signs and
laboratory findings, the more weight we will
give that opinion. . . .

(4) *Consistency*. Generally, the more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

In <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990), the
Fourth Circuit held that, when reviewing the decision of an ALJ,
the Court is limited to determining whether the record contains
substantial evidence to support the ALJ's findings and to whether
the correct law was applied. <u>Hays</u> further held that the Court
cannot substitute its judgment for that of the Commissioner. <u>Id</u>.

20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1) reserves the
ultimate decision regarding disability exclusively for the
Commissioner. Social Security Ruling (SSR) 96-5p at *3 provides:

If the case record contains an opinion from a
medical source on an issue reserved to the
Commissioner, the adjudicator must evaluate
all the evidence in the case record to
determine the extent to which the opinion is
supported by the record.

**A.    <u>General treating physician</u>**.

19

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

With regard to the opinions of Dr. Menez, Craig's treating physician, the ALJ determined:

> Treating physician Dr. Menez also completed two undated evaluation forms incidental to the claimant's eligibility for state welfare assistance benefits. One was completed indicating that the physician's last date of contact with the claimant had been on October 1, 2001, and the second indicated the last date of contact had been on November 26, 2002 (Exhibit 28F/2, 9). The earlier document appears to indicate primary diagnoses of hypertension, bipolar disorder and anxiety/depression. The latter document indicated purported diagnoses including hypertension, lumbosacral strain and sciatica, seizure disorder and anxiety/depressions (Id). On the older form completed after October 2001, Dr. Menez wrote only that the claimant was unable to work 'for now' (Exhibit 28F/9). On the more recent form completed after November 2002, the doctor wrote that the claimant's purported 'incapacity/disability' was indefinite and that he was to be evaluated 'yearly'. (Exhibit 28F/2). It appears that Dr. Menez is the claimant's primary care physician (Exhibit 34F/1). That physician has essentially acknowledged his lack of experience in the field of psychiatry and has deferred comment on the claimant's depression/mental status to other practitioners (sic). It is noted that Dr. Menez did advise the claimant with regard to the harm of any continued alcohol use in April 2001 and at that juncture also purported to indicate that the claimant was unable to work indefinitely because of seizure disorder, dehydration, depression and hypertension (Exhibit 8F/51).
>
> Dr. Menez's listed diagnoses for the claimant are longitudinally somewhat inconsistent and the doctor fails to include or mention the

claimant's acknowledged historical alcohol
problem. The Claimant has evidenced no
chronically disabling hypertension or seizure
disorder and it does not appear that Dr. Menez
has provided or is particularly qualified to
provide specialized psychological treatment or
services with regard to the claimant's alleged
depression. His physical examination of the
claimant at the hospital in April 2001 was
essentially unremarkable with regard to the
conditions as to which the claimant has since
complained. Dr. Menez added a diagnosis of
lumbar strain and sciatica in November 2002
but the claimant on November 6, 2002, told Dr.
Patel that he had never had any lower back
pain (Exhibits 25F/1 and 26F/2). Dr. Menez did
not mention seizure disorder in the assessment
completed after October 2001 but "resurrected"
such a historical diagnosis after November
2002 without any reported seizure activity in
the interim. While that physician has appeared
somewhat willing to support the claimant's
efforts to obtain disability benefits or
worker's compensation (see also Exhibit
20E/4), his statements as to the expected
duration of the claimant's purported
disability/inability to work have consistently
remained vague. It is also noted that opinion
on the issue of disability is expressly
reserved to the Social Security Commissioner.

On October 25, 2003, Dr. Menez wrote what the
Administrative Law Judge considers to be a
similarly vague and non-committal letter
indicating that the claimant was treated by
other physicians for anxiety and depression
and that the doctor would defer to them any
opinion on the claimant's psychiatric status.
Dr. Menez indicated that the claimant had
'followed up' with him on problems such as
degenerative joint disease of the cervical
spine, thoracic disc disease and seizure
disorder and that, in his (the physician's)
opinion, the claimant's symptoms were
'credible and consistent with objective

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

findings.' Such a generalization is really not
terribly informative because there are so few
objective medical findings. He neither offered
opinion as to the claimant's work-related
abilities at that juncture nor did he
specifically identify any symptoms or
condition that would prevent the claimant from
performing all work activity (Exhibit 43F/1).
The Administrative Law Judge concludes that
Dr. Menez has articulated no convincing and
objectively supported basis that would warrant
a finding that the claimant has been totally
incapable of performing any and all forms of
work activity for any period of 12 consecutive
months since April 12, 2001. For the foregoing
reasons, the undersigned does not accord that
physician's opinions as to the claimants work-
related abilities any controlling weight
herein.

In Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984), the

Fourth Circuit held that the opinion of a claimant's treating

physician is entitled to great weight and may only be disregarded

if there is persuasive contradictory evidence. 20 C.F.R.

§416.927(d)(2)provides that controlling weight may be given only in

appropriate circumstances to medical opinions, i.e., opinions on

the issue(s) of the nature and severity of an individual's

impairment(s), from treating sources, when the opinion is 1) well-

supported by medically acceptable clinical and laboratory

diagnostic techniques, and 2) not inconsistent with other

substantial evidence in the case record. To decide whether the

impairment is adequately supported by medical evidence, the Social

Security Act requires that impairment, physical or mental, be

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1. (4th Cir. 1990).

As noted above, the ALJ summarized almost the entire medical record before him and rejected the opinions of Dr. Menez as not supported by any clinical and laboratory diagnostic techniques and inconsistent with the other objective medical evidence in the record. Specifically, the ALJ noted that, although Dr. Menez appeared to be supportive of Craig's efforts to obtain disability, his statements regarding the expected duration of the Craig's purported disability and inability to work were vague.

Moreover, although Dr. Menez stated that Craig's symptoms were "credible and consistent with the objective medical findings," he failed to offer any opinion or objective medical findings that clearly demonstrated any symptoms or specific disability that would prevent Craig from performing all forms of work. Significantly, Dr. Menez failed to provide any specific proof to support the claim of completely disabling symptoms.

In fact, in April 2001, Dr. Menez noted Craig's physical examination as "essentially unremarkable." Moreover, on April 25, 2001, Dr. Menez signed a form from Craig's employer to excuse Craig

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

from work activity for a seizure disorder, hypertension, depression and dehydration that were "still resolving"; however, the form does not reflect a reference of debilitating or chronic neck injury, neck or back pain, headaches, alcohol abuse or rib injury. Finally, in January 2003, Dr. Menez rated Craig's prognosis as "fair."

Furthermore, Dr. Menez's opinion was inconsistent with the other medical evidence in the record. In September 2001, Dr. Patel reported Craig had a normal gait, could walk on his heels and toes and squat and arise, had a normal range of motion in all of his joints, had substantially normal muscle strength in all of his extremities except for a slight reduction in the right arm, had no muscle atrophy and an EKG within normal limits. In November 2002, Dr. Patel noted Craig had a satisfactory gait, required support to arise when attempting to squat, and had "some" sensory impairments and motor weakness in the right hand, Dr. Patel further noted that a lumbar spine X-ray was unremarkable.

On August 4, 2003, Dr. Azzouz reported some depression, no focal, motor or sensory deficits and no limitations in spinal joint movements and no spinal tenderness.  The ALJ noted this report as significant evidence, finding that "it was essentially a normal exam and is quite difficult to reconcile with the claimant's subjective complaints".

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

The Magistrate Judge noted that, after careful review of all of the medical evidence of record, the ALJ did not assign controlling weight to the opinion of Dr. Menez because the record did not contain any clinical and laboratory diagnostic techniques to support his opinion and his opinion was inconsistent with the objective medical evidence contained in the record.

After careful review and analysis of all of the evidence of record, the Magistrate Judge determined that the record contained substantial evidence to support the ALJ's decision not to assign controlling weight to the opinion of Dr. Menez, and also contained substantial evidence to support the weight the ALJ assigned to the opinion of Dr.Menez. The Court agrees.

B.    **Treating Psychologist**.

Craig contends that the ALJ failed to properly consider the opinions of his treating psychologist and, therefore, failed to assign the proper weight to that opinion.

20 C.F.R. Pt. 404, Subpt P, App1, 12.04 Affective Disorders provides:

>        Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
>        The required level of severity for these disorders is met when the requirements in both

A and B are satisfied, or when the
requirements in C are satisfied.

A.   Medically documented persistence,
either continuous or intermittent, of one of
the following:

1.  Depressive syndrome characterized by
at least four of the following:
a.   Anhedonia or pervasive loss of
interest in almost all activities; or
b.  Appetite disturbance with change in
weight; or
c.  Sleep disturbance; or
d.  Psychomotor agitation or retardation;
or
e.  Decreased energy; or
f.  Feelings of guilt or worthlessness;
or
g. Difficulty concentrating or thinking;
or
h.  Thoughts of suicide; or
i.  Hallucinations, delusions or paranoid thinking;

. . .

AND

B.   Resulting in at least two of the
following:
1.  Marked restriction of activities of
daily living; or
2.   Marked difficulties in maintaining
social functioning; or
3.   Marked difficulty in maintaining
concentration, persistence or pace; or
4.  Repeated episodes of decompensation,
each of extended duration . . . .

Regarding the opinions of Dr. Fast, the ALJ stated:

The claimant was again evaluated at Fairmont
Physicians Inc. (Behavioral Medicine) on
November 12, 2003, on that occasion by Jay H.
Fast, Ed. D. In the opinion of the
Administrative Law Judge, that psychologist

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

has clearly endorsed the claimant's subjective presentation and accepted the claimant's complaints without significant question or reservation. Dr. Fast noted that hopelessness and helplessness were the most prevalent aspects of the claimant's alleged symptomatology and indicated that the claimant manifested the most 'defeat' that he had seen in a long time. In the opinion of the undersigned, Dr. Last [sic] appears to project a significant amount of sympathy with regard to the claimant's financial plight. In that regard, the Administrative Law Judge notes that the claimant stopped working in April 2001 primarily for reasons (i.e., vomiting, nausea, elevated blood pressure, possible alcohol withdrawal) not related to his January 1999 work-related neck injury, which in December 2000 was adjudged by a physician to have reached maximum medical improvement. Already litigating an underlying worker's compensation claim, it would appear that the claimant, several months later, in effect committed himself for the foreseeable future to the Social Security disability process, absent indications of any chronically debilitating new injury or exacerbation in this physical condition or any totally disabling depression. Dr. Fast noted in November 2003 that the claimant, although reportedly without resources, access to medications or family support, 'persevered' nonetheless on a monthly food stamp allowance. While the Administrative Law Judge certainly sympathizes with those problems, financial need is not a proper basis for granting disability benefits. Dr. Last [sic] went on to state that the claimant was disabled 'with no doubt' and filled out a medical source statement upon which he rated the claimant's residual psychological abilities in every single functional area, with one exception, as 'poor.' The claimant was adjudged to retain 'fair' ability to demonstrate reliability (Exhibit 44F/1-3). The Administrative Law

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Judge finds a document completed in such a fashion to be of highly suspect reliability as an indicator of the claimant's true abilities and, accordingly, does not believe that it is entitled to any controlling weight herein. There is no convincing longitudinal evidence to indicate that the claimant has 'poor' ability to understand, remember and carry out even 'simple' job instructions or 'poor' ability to function independently. Dr. Last [sic] rather indiscriminately drew a straight line down the 'poor' rating column in all of three major functional categories (with the exception of reliability) noting only that such ascribed ratings were due to the claimant's 'pain and depression.' No other explanation is given, beyond perhaps the claimant's 'defeated' presentation.

It is not credible to the Administrative Law Judge that the claimant has some, but no more than 'poor,' ability in essentially every functional area. Such a finding is neither reasonable nor likely under the circumstances. Moreover, such a finding is clearly inconsistent with other reliable evidence of record indicating that the claimant's attention, concentration, memory ranges, persistence, and pace were only mildly to moderately impaired at most. It does not appear that Dr. Last [sic] has ever even endeavored to test the claimant's actual ability in those areas. If he has, such findings are not included in the notes. The Administrative Law Judge does not accept Dr. Fast's opinions as to the claimants' (sic) functional abilities because they were rendered on an essentially blanket, indiscriminate basis; are inadequately supported by discussion or specific testing; appear predominately based upon the claimant's subjective statements; and are inconsistent with other evidence of record as has been discussed. Additional records from Fairmont Physicians Inc. dated November 20, 2003,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

indicate a diagnosis of bipolar disorder
(Exhibit 48F/11). As noted above, such a
diagnosis is not supported within the
longitudinal record. There is no consistent
evidence of manic behavior on the claimant's
part and in fact, his behavior would appear to
be quite the opposite of manic.

In his opinion, Dr. Fast asserts that Craig had a poor mental
ability to deal with any aspect of working. The objective medical
evidence of record summarized earlier in this Order clearly
contradicts this opinion.

In September 2002, a therapist at United Summit Center
indicated that Craig was well-oriented, his concentration and
attention were grossly intact, his intelligence was average and his
insight and judgment were fair. The therapist rated Craig's
symptoms as only moderate in nature and questioned Craig's
credibility with regard to his complaints.

In October 2002, Peggy Allman, M.A. completed a mental status
evaluation and indicated a Diagnostic Impression of Axis I: Major
depressive disorder, recurrent, moderate, pain disorder associated
with psychological features, chronic, Agoraphobia without a history
of panic disorder; Axis II: V71.09; Axis III: Degenerative
arthritis, compressed vertebrae, right side headaches as reported
by client.

Ms. Allman further indicated that Craig's prognosis was good,
that his daily activities included caring for his own hygiene,

cooking, trying to clean and wash clothes, shopping only early in the day, driving and watching television, normal social functioning with examiner, limited social functioning with an occasional visitor, no church attendance or social or civic organizations, average concentration, mildly deficient persistence, pace within normal limits, moderately deficient immediate memory, recent and remote memory within normal limits and that Craig could manage his own finances.

In October 2002, Frank D. Roman, M.D., completed a Residual Functional Capacity Assessment, Mental, and indicated no significant limitations in Craig's abilities in the areas assessed. Roman also indicated Craig was able to perform routine activities and follow two to three step directions in a low stress setting.

Significantly, Dr. Roman noted only mild functional limitations in restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace and no repeated episodes of decompensation.

Thus, the overwhelming weight of the evidence demonstrates that Craig fails to meet the criteria prescribed in 20 C.F.R. Pt. 404, Subpt P, App1, 12.04 Affective Disorders. Accordingly, the Magistrate Judge determined that the record contained substantial evidence to support the ALJ's decision not to assign controlling weight to the opinion of Dr. Fast and, further, contains

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

substantial evidence to support the weight the ALJ assigned to Dr.

Fast's report. The Court agrees.

C.    **Pain Management Specialist**

        Craig also contends that the ALJ failed to assign the proper

weight to the opinions of the pain management specialist.

        The ALJ noted:

> The claimant was examined at a pain management
> center on December 24, 2003 (Exhibit 46F/10-
> 12). The Administrative Law Judge is of the
> experience-based opinion that pain management
> doctors routinely diagnose, validate and treat
> most subjective symptoms of chronic pain as
> may be alleged by those individuals who have
> been referred for or who are otherwise seeking
> such treatment, inasmuch as such physicians
> are specifically engaged in that particular
> business capacity. That December 2003
> examination and the one performed by Dr.
> Azzouz four months earlier would almost appear
> to involve two different persons and are
> nearly impossible to reconcile. While Dr.
> Azzouz found essentially no motor or range of
> motion limitations, the pain clinic doctor
> found decreased strength in the upper
> extremities, arm limitations, and 'exquisite'
> tenderness over the lower rib area. One of the
> diagnoses was diffuse myofascial pain. The
> Administrative Law Judge noes that this is the
> only time such a diagnosis appears in the
> record and that it is not supported because of
> the absence of bands and knots of tense
> muscle. The undersigned further notes that Dr.
> Azzouz is board-certified in neurology. It is
> not clear what the pain management doctor's
> speciality is. The Administrative Law Judge
> also notes that the claimant on that occasion
> attributed only 'headaches' to his 1999
> purported occupational injury and alleged that
> his neck pain and arm numbness had not begun

until after he had been administered CPR at
the hospital in April 2001 (Exhibit 46/10).

The Administrative Law Judge finds that
statement to be fundamentally inconsistent
with the claimant's prior and longitudinal
statements of record and significantly
damaging to the claimant's overall
credibility. Clearly, claimant had previously
attributed neck pain and numbness to his
January 1999 work injury and alleged that CPR
administered in April 2001 had resulted in
'torn cartilage' between his ribs and spine.
The claimant appears again to have articulated
his alleged symptoms in a somewhat haphazard
fashion that as a result appears merely
calculated towards supporting a claim for
financial benefits. In the experience-based
opinion of the undersigned, pain management
doctors also tend to treat almost exclusively
by injections and prescribed narcotic pain
medications and such a treatment regime was
followed in the claimant's case (Exhibit
46F/1, 12). On February 3, 2004, the claimant
returned to the pain management center.
Although he acknowledged almost complete pain
relief after intercoastal nerve block for
about two to three hours, he stated that this
mid-back pain gradually came back and was
again at a severity of 'eight out of ten'
(Exhibit 46F/2). In the opinion of the
Administrative Law Judge, no longitudinal
evidence supports any consistently and totally
debilitating muscoloskeletal, seizure-related
or headache condition since April 12, 2001.
The claimant's ongoing pain complaints
escalated significantly after he ceased work
activity in April 2001 absent any evidence of
significant new injury, deterioration or
exacerbation in his overall physical
condition. An independent medical examiner had
adjudged the claimant's neck condition to be
at maximum medical improvement as of December
2000, at which time the claimant had for some
time remained gainfully employed.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

While the notes from United Pain Management for the period from December 24, 2003 through March 2, 2004 do indicate an assessment of diffuse myofascial pain in the midthoracic left more than the right, musculoskeletal rib pain on the left side and neck pain with some right-sided radicular symptoms, the record contains RFCs all of which indicate that Craig retained the capacity to perform work requiring a light to medium range of physical exertion, with some additional impairment-related limitations. In September 2001, Fulvio R. Franyutti, M.D., indicated that Craig could occasionally lift 50 lbs., frequently lift 25 lbs., stand or sit 6 hours in an 8 hour workday, had unlimited ability to push and pull, had the ability to frequently balance, stoop, kneel, crouch, crawl, had no manipulative limitations, had no visual limitations, had no communicative limitations, must avoid extreme cold, extreme heat and had to avoid concentrated exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards. Dr. Franyutti reduced Craig's RFC to medium due to pain.

In February 2002, Cynthia Mae Osborne, M.D., offered a diagnosis of seizure disorder, headaches and cervical sprain and indicated Craig could occasionally lift 50 lbs, frequently lift 25 lbs, sit or stand 6 hours in an 8-hour workday and had unlimited ability to push and/or pull, could occasionally climb, balance, stoop, kneel, crouch or crawl, had no manipulative, visual or

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

communicative limitations, had no environmental limitations except for the need to avoid hazards.  Dr. Osborne reduced Craig's RFC to medium with height and hazard restrictions.

In November 2002, Thomas Lauderman, D.O., indicated Craig could occasionally lift 50 lbs., frequently lift 25 lbs., sit or stand 6 hours of an 8 hour work day, had unlimited ability to push and pull, could never climb ramps or stairs due to the seizure disorder, could frequently balance, stoop, kneel, crouch or crawl, had limited ability in handling and fingering, had unlimited reaching in all directions and feeling, had no visual or communicative limitations, and had to avoid exposure to extreme cold and hazards but no other environmental limitations. Dr. Lauderman reduced Craig's RFC due to pain and fatigue.

In January 2003, Fulvio Franyutti, M.D., saw Craig again and indicated Craig could occasionally lift 20 lbs., frequently lift 10 lbs., sit or stand 6 hours of an 8 hour work day, unlimited ability to push and pull,  could occasionally climb ramps or stairs, could never climb ladders, ropes or scaffolds due to seizure disorder, could frequently balance, stoop, kneel, crouch or crawl, had no manipulative, visual or communicative limitations, had to avoid concentrated exposure to extreme cold and had to avoid all exposure to hazards. Franyutti reduced Craig's RFC to light due to seizures and pain.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

After reviewing all the evidence of record, the Magistrate Judge determined that the record contained substantial evidence to support the ALJ's decision not to assign controlling weight to the opinion of the pain management physician and contained substantial evidence to support the weight the ALJ assigned to the opinion of the pain management physician. The Court agrees.

**VII. CONCLUSION**

Upon examination of the plaintiff's objections, The Court concludes that Craig has not raised any issues that were not thoroughly considered by Magistrate Judge Seibert in his report and recommendation. Moreover, after an independent <u>de</u> <u>novo</u> consideration of all matters now before it, the Court is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances before the Court in this action. Therefore, it is

**ORDERED** that Magistrate Judge Seibert's Report and Recommendation be accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate. Accordingly,

1.  the defendant's motion for Summary Judgment (Docket No. 11) is **GRANTED**;

2.  the plaintiff's motion for Summary Judgment (Docket No. 10) is **DENIED**; and

CRAIG V. BARNHART                                    1:05CV78

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**
_____

    3.    this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED**

        from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

The Clerk of the Court is directed to transmit copies of this Order to counsel of record.

DATED: September 29, 2006.

                    /s/ Irene M. Keeley
                    IRENE M. KEELEY
                    UNITED STATES DISTRICT JUDGE